# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,       )
                          )    No. 73107-6-I
          Respondent,      )
                          )    DIVISION ONE
    v.                     )
                          )
SEAN LAWARD GRAHAM,        )    UNPUBLISHED OPINION
                          )
          Appellant.       )
                          )    FILED: April 25, 2016
_____)

TRICKEY, A.C.J. — Sean Graham appeals his convictions for one count of first degree assault and three counts of custodial assault. He argues the trial court abused its discretion when it denied his motion for mistrial after a witness referred to his cell block as a "disciplinary unit." He also contends his exceptional sentence is improper because the State failed to present sufficient evidence to support the aggravating factor of particular vulnerability and that the statute permitting this factor is unconstitutionally vague.

Because the allegedly prejudicial comments did not warrant a mistrial, we conclude the trial court did not abuse its discretion when it denied the motion. Further, the record shows the State presented sufficient evidence to support the aggravating factor, and Graham's vagueness challenge fails. We affirm the judgment and sentence.

## FACTS

In January 2011, Sean Graham was an inmate at King County's Maleng Regional Justice Center in Kent, Washington. Graham was held in "Nora East," a segregation unit—also known as solitary confinement—in which inmates

remain in individual cells for 23 hours per day, and are allowed out for one hour to bathe, make phone calls, receive visits, exercise, and do other activities.[1] On January 9, 2011, Corrections Officer Gil Letrondo was on duty in Nora East when officers performed a security check of the cells. One officer discovered contraband food in Graham's cell. The sergeant on duty determined the food constituted a rule infraction and decided that Graham would lose his hour out of his cell the following day.

On January 10, Letrondo told Graham that he had lost his hour out that day. Letrondo testified that this made Graham "very mad."[2] Graham called Letrondo a "pussy motherfucker," and said, "Let me out. I'll beat you up and kill you."[3]

On January 11, the next day, Officer Michael Wells was monitoring Nora East while Graham was outside of his cell. Letrondo arrived to relieve Wells for a 15-minute break. Wells asked Letrondo if Graham should go back into his cell, but Letrondo declined, stating he "didn't want to aggravate the situation."[4] Wells left Letrondo to monitor Nora East for approximately 12 minutes. After Wells returned, he and Letrondo stood at a central officer counter discussing a

---

[1] 2 Report of Proceedings (RP) (Nov. 3, 2014) at 52; 10 RP (Nov. 18, 2014) at 36. Consistent with the parties, the verbatim report of proceedings are numbered as follows: 1RP (Oct. 30, 2014); 2RP (Nov. 3, 2014); 3RP (Nov. 4, 2014); 4RP (Nov. 5, 2014); 5RP (Nov. 10, 2014); 6RP (Nov. 12, 2014—opening statements); 7RP (Nov. 12, 2014); 8RP (Nov. 13, 2014); 9RP (Nov. 17, 2014); 10RP (Nov. 18, 2014); 11RP (Nov. 24, 2014); 12RP (Nov. 25, 2014); 13RP (April 11, 2011 through Dec. 28, 2011); 14 RP (March 7, 2012 through Nov. 27, 2012); 15RP (Feb. 27, 2013 through Dec. 4, 2013); 16RP (March 17, 2014 through April 9, 2014—competency hearing); and 17RP (Jan. 9, 2015—sentencing).
[2] 10 RP (Nov. 18, 2014) at 129.
[3] 10 RP (Nov. 18, 2014) at 129-30.
[4] 10 RP (Nov. 18, 2014) at 132.

computer issue. Wells glanced down at a logbook. When he looked up, he saw Graham approximately two feet away from Letrondo, "moving very fast towards him."[5]

Graham struck Letrondo in the temple area with a closed fist. Letrondo stumbled back four or five steps. Wells hit Graham in the face and made a "code blue" distress call on his radio.[6] Graham ran over to Letrondo and hit him a second time, and Letrondo stumbled and fell against the back wall. Letrondo fell to the floor and stopped moving. He appeared to be unconscious.

Wells rushed over and exchanged blows with Graham. Graham struck Wells in the jaw, knocking him backwards briefly. While Wells was dazed, Graham stomped on Letrondo, who was still motionless on the floor:

> At that point, inmate Graham ran over and started jumping up and down on top of Officer Letrondo, stomping on the upper part of his body here around the neck and head area.
>
> . . . .
>
> He was jumping in the air as high as he could and stomping down with one foot on top of him.[7]

Letrondo never moved while this occurred. Wells reengaged with Graham and got him off Letrondo. Wells and three other officers eventually subdued Graham and placed him in a holding cell down the hall in another part of the jail.

Other officers responded to Letrondo, who was lying motionless on the floor with a pool of blood around his head. Letrondo exhibited labored breathing and could not speak. He had memory problems and could not identify the

---

[5] 10 RP (Nov. 18, 2014) at 49.
[6] 10 RP (Nov. 18, 2014) at 53.
[7] 10 RP (Nov. 18, 2014) at 55.

3

president or recall where he was. He spent three days at Valley Medical Center, where doctors discovered injuries to Letrondo's face, chest, and the back of his head. A CT (computed tomography) scan revealed internal bleeding around his brain. Letrondo later required nose surgery, and he suffered from memory problems for years following the incident. He never returned to work.

The State charged Graham by first amended information with one count of first degree assault with two aggravating factors, four counts of custodial assault, and one count of harassment. Count 1 alleged that on January 11, 2011, Graham assaulted Letrondo with intent to inflict great bodily harm and with force and means likely to produce great bodily harm or death. The first aggravating factor alleged that Graham knew or should have known that Letrondo was particularly vulnerable or incapable of resistance, and that Letrondo's vulnerability was a substantial factor in the commission of the offense. The second aggravating factor alleged that Graham committed the offense against a law enforcement officer who was performing his official duties at the time of the offense. Counts 2 through 5 alleged that Graham intentionally assaulted Officers Michael Wells, Marcial Williamson, Michael Allen, and Timothy Wright. Count 6 alleged that Graham threatened Corrections Officer Sharon Coleman with bodily harm.

The State agreed to sever count 6 and continued to trial on counts 1 through 5. The jury convicted Graham on counts 1 through 4, finding both aggravating factors in count 1. The jury acquitted Graham on count 5—custodial assault of Timothy Wright. Following the trial, the State dismissed count 6.

The court imposed an exceptional sentence of 301 months on count 1, which included the high end of the standard range for assault in the first degree with an offender score of 8 plus 12 additional months per aggravating factor. The court imposed standard-range terms of 43 months each on counts 2 through 4, to run concurrently with count 1. Graham appeals.

ANALYSIS

Mistrial

Graham argues the trial court abused its discretion when it denied his motion for a mistrial after a State witness violated the trial court's motion in limine by indicating that Graham occupied a segregated unit intended for "ultra security" inmates with disciplinary violations.[8]

During motions in limine, the State sought the court's permission to discuss Graham's custody status. The State wanted to explain that Nora East was an area designated for "administrative segregation" for "inmates who have had disciplinary problems."[9] The State argued the circumstances surrounding Graham's custody were relevant to explain the physical layout of the area where the crime occurred and the unique policies affecting inmates residing in Nora East—namely, that they are permitted outside of their solitary cells for only one hour each day.

---

[8] 7 RP (Nov. 12, 2014) at 42.
[9] 2 RP (Nov. 3, 2014) at 50.

5

The court agreed with the State, but noted its concern that testimony regarding Nora East could imply that the inmates in that unit exhibit a propensity for violence:

> Well, it's clearly relevant, what the layout of the area was, where the incident occurred, that there's limited access to common areas, limited access to the cells, that it's not an open pod, the one-hour rule. All that is clearly relevant.
> My concern is saying that he was in an administrative segregation does strongly imply that's because of prior disciplinary problems, which could lead the jury to infer a propensity for violence.[10]

The court reserved ruling on the issue and told the parties to propose a solution for how to refer to Nora East:

> Maybe you and [defense counsel] could talk about that. So I'm going to reserve on that, whether this is going to be referred to as administrative segregation or a segregated unit. Clearly, the layout, the rules, that's all important. The label can be problematic. So if the two of you can't work something out, I'm happy to have you bring it back to me and I'll decide.[11]

Neither party raised the issue again for a specific ruling.

Officer John Hurt, a witness for the State, made several comments prompting Graham to move for a mistrial. When describing Nora East, Hurt stated that it "was primarily a disciplinary unit."[12] Graham did not object. Moments later, Hurt made a similar comment: "Nora East it—like I said, it was a disciplinary or . . . ."[13] Again, Graham did not object.

---

[10] 2 RP (Nov. 3, 2014) at 52-53.
[11] 2 RP (Nov. 3, 2014) at 56.
[12] 7 RP (Nov. 12, 2014) at 10.
[13] 7 RP (Nov. 12, 2014) at 11.

The court on its own called for a recess. Referring to the earlier discussion during motions in limine, the court told the State that witnesses should avoid discussing disciplinary issues and instead use the term "segregated unit":

> The witness twice said "disciplinary unit," and I thought I was pretty clear in the motions in limine, witnesses are not to testify to that. I think I said they could use the term "segregated unit," but nothing about discipline.[14]

The prosecutor responded that he had discussed that issue with witnesses. He further noted that any prejudice at that time was minimal because the parties had already discussed that "Nora East is a unit where inmates are locked up for 23 hours out of every day, and anybody with common experience . . . knows that that is suggestive of what might be referred to colloquially as 'solitary confinement.'"[15]

Defense counsel told the court that, prior to Hurt's testimony, he sent an e-mail to every witness reminding them not to testify "about the status of Nora East or why people are put in Nora East."[16] The court reminded the witness to use the term "segregated unit" rather than "disciplinary unit."[17] After Hurt's testimony continued, he referred to Graham as a "high security inmate": "I actually transported him, myself and Officer Lang, to the King County Jail . . . where he was made a[n] ultra security inmate . . . ."[18] Graham objected and moved to

---

[14] 7 RP (Nov. 12, 2014) at 12.
[15] 7 RP (Nov. 12, 2014) at 12.
[16] 7 RP (Nov. 12, 2014) at 14.
[17] 7 RP (Nov. 12, 2014) at 13.
[18] 7 RP (Nov. 12, 2014) at 41-42.

strike the statement.  The court sustained the objection and instructed the jury to

disregard Hurt's comment.

During a recess before Hurt's cross-examination, Graham moved for a

mistrial based on Hurt's statements:

> Your honor, at this point, despite repeated warning, this witness feels compelled to mention or discuss, despite any lack of questioning that would elicit this, Mr. Graham's security status, and, most recently that he was transferred to the King County Jail for the completely irrelevant reason that he was being transferred to an ultra security status.
> Your honor, I feel compelled to make a motion for a mistrial at this point.  This witness has flagrantly violated the court's pretrial orders.[19]

The court denied the motion, concluding that Hurt's comments did not deprive

Graham of a fair trial:

> I don't find that—as a result of this comment, that Mr. Graham can no longer get a fair trial.  It doesn't rise to the level of that.
> There's been testimony about solitary confinement.  I think any reasonable juror would probably infer that after the incident, as described by the witness, that Mr. Graham would be going into some sort of more secure situation.
> I will—I sustain the objection, I struck the comment, I'll offer a curative instruction, if one is recommended by defense.[20]

Defense never sought a curative instruction.

Graham argues Hurt's testimony was so prejudicial it deprived him of a fair

trial.  He contends the trial court abused its discretion when it declined to grant

his motion for a mistrial.

---

[19] 7 RP (Nov. 12, 2014) at 43.
[20] 7 RP (Nov. 12, 2014) at 45-46.

We review a trial court's denial of a motion for mistrial for an abuse of discretion. State v. Mak, 105 Wn.2d 692, 701, 719, 718 P.2d 407 (1986). A trial court abuses its discretion only "when no reasonable judge would have reached the same conclusion." Sofie v. Fibreboard Corp., 112 Wn.2d 636, 667, 771 P.2d 711 (1989). "The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly. Only errors affecting the outcome of the trial will be deemed prejudicial." Mak, 105 Wn.2d at 701. In determining whether a trial irregularity caused such prejudice as to require a mistrial, we examine (1) its seriousness, (2) whether it involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it. State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989). We conclude the trial court acted within its discretion when it denied Graham's motion for mistrial.

First, Hurt's comments did not cause serious prejudice within the context of the trial. Although the record shows the court expressed concern that discussing Graham's administrative segregation would "strongly imply" Graham exhibited "disciplinary problems," the court never issued a definitive ruling prohibiting the term "disciplinary unit."[21] Instead, the court reserved ruling and allowed the parties to develop their own solution. When Hurt referred to Nora East as a "disciplinary unit," he did not clearly violate a ruling from the court. Indeed, Graham did not object to either of Hurt's comments. Graham objected

---

[21] 2 RP (Nov. 3, 2014) at 52-53.

9

only to Hurt's use of the term "ultra security inmate."[22] The court immediately sustained the objection and instructed the jury to disregard Hurt's comment.

Second, Hurt's testimony was arguably cumulative. Even despite the court's concern that discussion of Graham's custody status would improperly imply a propensity for violence, both parties introduced evidence of his confinement. For example, Graham's defense relied in part on the stresses induced through solitary confinement:

> [Graham] had been in jail for a long time, he was locked in a cell, by himself, 23 hours a day. And in the course of his life in the jail, he faced the constant stresses and indignities that come from the fact that nothing of his life was something that he could personally control.
> [T]he constant stress, struggle, and indignity of his situation boiled to the point where he lost control of himself.[23]

During the trial, Graham solicited testimony about the isolation of Nora East and the reasons an inmate might be placed there. In one exchange, defense counsel specifically asked a corrections officer if inmates might be placed in Nora East due to disciplinary problems:

[Defense Counsel]: I'd like to talk a little bit about life in the Nora East unit. First of all, people might be in that unit, or inmates might be in that unit, for a number of reasons; is that right?

[Sergeant Cabrera]: Yes.

[Defense Counsel]: Sometimes they're there because they're a disciplinary problem?

[Sergeant Cabrera]: Yes.[24]

---

[22] 7 RP (Nov. 12, 2014) at 43.
[23] 6 RP (Nov. 12, 2014—opening statements) at 15.
[24] 8 RP (Nov. 13, 2014) at 77 (emphasis added).

When cross-examining Letrondo, defense counsel again stated that inmates in Nora East exhibit "behavioral problems" and that these problems could exist before residing in Nora East:

> [Defense Counsel]: Now, it's fair to say that people can be in—a number of people in Nora East have behavior problems, right?
>
> [Mr. Letrondo]:     Yes.
>
> [Defense Counsel]: In fact, some of them have problems that have nothing to do with being in Nora East, meaning their mental problems or behavioral problems are from before they were ever sent to Nora East?
>
> [Mr. Letrondo]:     I wouldn't know that.[25]

Following this exchange, the State asked Letrondo on re-direct whether some inmates had "preexisting problems or issues with violence."[26] Graham did not object. The State then asked Letrondo if any other inmates in Nora East had attacked him before. Graham objected, but the court ruled Graham's cross-examination "opened the door" to further evidence about inmates in Nora East.[27] Therefore, in the context of other testimony at trial, Hurt's references to Nora East as a "disciplinary unit" were cumulative with other witness statements. The record shows that even defense counsel made statements about inmates in Nora East exhibiting "disciplinary problems" and "behavioral problems."

Third, the court took steps to mitigate any prejudice. When Graham failed to object to Hurt's initial comments describing Nora East as a "disciplinary unit,"

---

[25] 10 RP (Nov. 18, 2014) at 161.
[26] 10 RP (Nov. 18, 2014) at 163.
[27] 10 RP (Nov. 18, 2014) at 163.

11

the court called for a recess on its own and reminded the parties that witnesses should avoid using this terminology.[28] After Graham objected to the "ultra security inmate" comment, the court sustained the objection and properly instructed the jury to disregard the comment.[29] In response to Graham's motion for a mistrial, the court offered a curative instruction "if one is recommended by defense."[30] Graham never asked for one.

Further, we are not convinced Hurt's comments affected the outcome of the trial. See Mak, 105 Wn.2d at 701 ("Only errors affecting the outcome of the trial will be deemed prejudicial."). As discussed above, counsel and witnesses made several statements about Graham's custody status, Nora East, and the potential disciplinary problems exhibited by some inmates residing there. Defense counsel made and solicited some of these statements.

The jury also heard lengthy and vivid evidence of the assault, Letrondo's injuries, and the injuries to the other officers who responded to restrain Graham. Graham insists Hurt's comments unfairly depicted Graham as a "bad or violent character," and that the testimony was "too powerfully tempting to ignore."[31] But the jury acquitted Graham of one of the custodial assault charges, suggesting the jury was not motivated by improper prejudice. Under these circumstances, it is unlikely Hurt's comments affected the outcome of the trial. We therefore cannot say that "no reasonable judge would have reached the same conclusion"

---

[28] 7 RP (Nov. 12, 2014) at 11-12.
[29] 7 RP (Nov. 12, 2014) at 43.
[30] 7 RP (Nov. 12, 2014) at 46.
[31] Br. of Appellant at 15.

regarding Graham's motion for mistrial.  Sofie, 112 Wn.2d at 667.  The trial court did not abuse its discretion when it denied the motion.

Aggravating Factor of Particular Vulnerability

Graham argues the State failed to present sufficient evidence to support the aggravating factor of particular vulnerability or incapability of resistance.

The jury was instructed that if it found Graham guilty of first degree assault, it must then decide "[w]hether the defendant knew or should have known that the victim was particularly vulnerable or incapable of resistance" beyond a reasonable doubt.[32]  The court further instructed the jury that "particularly vulnerable" means the victim "is more vulnerable to the commission of the crime than the typical victim of Assault in the First Degree" and "the victim's vulnerability is a substantial factor in the commission of the crime."[33]  During closing argument, the State emphasized that Letrondo was particularly vulnerable to the assault because he became unconscious:

> Was the victim in the current offense particularly vulnerable or incapable of resistance?
> When you find the defendant guilty of assault in the first degree, I ask that you answer this question "Yes."
> What we are referring to is about when Officer Letrondo was on the ground, unconscious.  The defendant knew that, yet he continued to stomp on him.  You heard from Officer Williamson how the victim's body was bouncing off the ground when he was being stomped on.  That clearly is particularly vulnerable.[34]

---

[32] Clerk's Papers (CP) at 199, 201.
[33] CP at 202.
[34] 11 RP (Nov. 24, 2014) at 119.

A court may impose an exceptional sentence based on the aggravating factor of vulnerability if the jury concludes beyond a reasonable doubt that "[t]he defendant knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance." RCW 9.94A.535(3)(b). The victim's vulnerability must have been a substantial factor in the commission of the crime. State v. Suleiman, 158 Wn. App. 280, 291-92, 143 P.3d 795 (2006). We review a court's decision to impose an exceptional sentence based on an aggravating factor for sufficient evidence. State v. Gordon, 172 Wn.2d 671, 680, 260 P.3d 884 (2011). "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Although this aggravating factor typically involves "victims who are particularly vulnerable before the attack began," we have recognized that an assault victim is particularly vulnerable when rendered unconscious by the initial attack and then further assaulted. State v. Ogden, 102 Wn. App. 357, 367, 7 P.3d 839 (2000); see also State v. Baird, 83 Wn. App. 477, 922 P.2d 157 (1996). In Baird, the defendant beat his wife unconscious and then surgically disfigured her face. Baird, 83 Wn. App. at 479. The defendant argued the particular vulnerability aggravating factor did not apply, arguing that "it would set a 'dangerous precedent' if this court concluded the victim was particularly vulnerable because of the assault itself." Baird, 83 Wn. App. at 489. The court rejected this argument, concluding that "a victim beaten unconscious and then

14

further assaulted is surely no less vulnerable than a sleeping victim." Baird, 83 Wn. App. at 489.

Similarly, in Ogden, the defendant hit the victim several times on the head and then continued the assault after the victim was unconscious. Ogden, 102 Wn. App. at 360. The defendant argued the particularly vulnerable aggravating factor did not apply because the victim was not unconscious before the defendant hit him. Ogden, 102 Wn. App. at 366. But the court emphatically rejected this argument and reaffirmed the principle in Baird:

> [W]e soundly reject the premise that an assailant who beats a victim into unconsciousness thereby rendering him or her totally helpless, and then takes advantage of that helplessness to inflict gratuitous additional injuries is not subject to a finding by the sentencing court that an exceptional sentence upward or a manifest injustice disposition is warranted based on vulnerability of the victim.

Ogden, 102 Wn. App. at 369. The court further explained that the State was not required to show "evidence of a temporal break" between the initial assault and the harm incurred following the victim's unconsciousness. Ogden, 102 Wn. App. at 368.

The record here shows the State provided sufficient evidence to prove Letrondo was particularly vulnerable due to his inability to resist Graham's attack. Multiple witnesses testified that Graham's attack rendered Letrondo unconscious and that Graham continued to attack Letrondo. Wells, who was only few feet away, testified that after Graham's second punch, Letrondo fell backwards, hit a wall, and then lay motionless on the ground. He testified that Graham rushed over to Letrondo and began stomping and jumping on Letrondo's face, neck, and

chest. Viewing this testimony in the light most favorable to the State, a rational trier of fact could have concluded that Letrondo was particularly vulnerable due to unconsciousness and that this vulnerability was a substantial factor in the commission of the crime. See Gordon, 172 Wn.2d at 680.

Graham does not dispute that Letrondo was rendered unconscious or that Graham continued to attack Letrondo after that point. Instead, Graham argues that the rule articulated in Baird and Ogden does not apply to this case. We disagree.

Graham primarily argues that Baird and Ogden are inapplicable because those cases were decided before Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). In Blakely, the court held that a jury—not a judge—must find evidence to prove an aggravating factor sufficient beyond a reasonable doubt before the court imposes an exceptional sentence. 542 U.S. at 313-14. Therefore, Graham argues Baird and Ogden are distinguishable because those cases relied on a sentencing procedure the Blakely court determined is unconstitutional. But although Blakely invalidated the procedure for imposing an exceptional sentence, nothing in Blakely casts doubt on the substantive rule in Baird and Ogden. An aggravating factor of particular vulnerability may still be appropriate when a defendant renders the victim unconscious and continues to inflict gratuitous harm. Blakely simply requires that a jury find sufficient evidence for the aggravating factor beyond a reasonable doubt before the court can use the factor to justify an exceptional sentence. In other words, Blakely did not change what constitutes an aggravating factor. It

only clarified who the factfinder must be and the burden of proof the State must meet before an aggravating factor affects a defendant's sentence.

Graham further attempts to distinguish Baird and Ogden on their facts. We are unpersuaded. Like this case, both Baird and Ogden involved defendants who rendered a victim unconscious before inflicting additional harm on that victim. The relative severity of harm inflicted on the different victims is not relevant to whether sufficient evident supports the aggravating factor in this case. Nor is it relevant that the defendant in Ogden was charged with murder and Graham was not. Particular vulnerability can be an aggravating factor when the victim is rendered vulnerable "because of injuries . . . sustained during the perpetrator's attack." Ogden, 102 Wn. App. at 367.

Graham also argues that his case differs from Baird and Ogden because it involved a "single violent attack."[35] But the court rejected a similar argument in Ogden. See Ogden, 102 Wn. App. at 368 (there need not be a "temporal break" between initial attack and subsequent harm). Here, Baird and Ogden support the application of an aggravating factor for particular vulnerability. See Ogden, 102 Wn. App. at 368 ("'a victim beaten unconscious and then further assaulted is surely no less vulnerable than a sleeping victim'") (quoting Baird, 83 Wn. App. at 489). The record shows that sufficient evidence supports the jury's conclusion that the State proved the aggravating factor beyond a reasonable doubt.

---

[35] Br. of Appellant at 33.

<u>Vagueness</u>

Finally, Graham argues that the aggravating factor for particular vulnerability is unconstitutionally vague.

A statute is unconstitutionally vague under the due process clause of the Fourteenth Amendment if (1) it fails to define the offense with sufficient precision that a person of ordinary intelligence can understand it, or (2) it does not provide standards sufficiently specific to prevent arbitrary enforcement. <u>State v. Eckblad</u>, 152 Wn.2d 515, 518, 98 P.3d 1184 (2004). Both prongs of the vagueness doctrine focus on laws that prohibit or required conduct. <u>State v. Baldwin</u>, 150 Wn.2d 448, 458, 78 P.3d 1005 (2003). In <u>Baldwin</u>, the court explained that sentencing aggravators are not subject to a vagueness challenge because they do not prohibit or require conduct:

> The sentencing guideline statutes challenged in this case do not define conduct nor do they allow for arbitrary arrest and criminal prosecution by the State . . . . Sentencing guidelines do not inform the public of the penalties attached to criminal conduct nor do they vary the statutory maximum and minimum penalties assigned to illegal conduct by the legislature. A citizen reading the guideline statutes will not be forced to guess at the potential consequences that might befall one who engages in prohibited conduct because the guidelines do not set penalties. Thus, the due process considerations that underlie the void-for-vagueness doctrine have no application in the context of sentencing guidelines.

<u>Baldwin</u>, 150 Wn.2d at 459; <u>see also</u> <u>State v. Jacobson</u>, 92 Wn. App. 958, 966, 965 P.2d 1140 (1998) (Aggravating factors "'are simply not susceptible to a vagueness attack.'") (quoting <u>United States v. Wivell</u>, 893 F.2d 156, 159 (8th Cir. 1990)). Therefore, for the reasons articulated in <u>Baldwin</u>, Graham's vagueness challenge fails.

We find Graham's arguments to the contrary unpersuasive. Graham contends that, post-Blakely, there is a "now-irrefutable proposition that aggravating circumstances operate as elements of a higher offense."[36] But the Washington Supreme Court has somewhat recently stated that "an aggravating factor is not the functional equivalent of an essential element." State v. Siers, 174 Wn.2d 269, 271, 274 P.3d 358 (2012); see also Gordon, 172 Wn.2d at 687-79 (The particular vulnerability aggravating factor is not the functional equivalent of an element of the offense.).

Graham also relies on death penalty cases, arguing that "a sentencing provision is unconstitutionally vague . . . if it 'fails to adequately inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid . . . .'"[37] But these cases do not apply here because sentencing courts are permitted more discretion in noncapital cases. See Baldwin, 150 Wn.2d at 460 ("in noncapital cases a defendant does not have a constitutional right to sentencing guidelines").

Baldwin controls our analysis here. See State v. Gore, 101 Wn.2d 481, 487, 681 P.2d 227 (1984) (this court is obliged to follow directly controlling authority of the Washington Supreme Court). Under that case, Graham's vagueness challenge to the particularly vulnerable aggravating factor fails.

---

[36] Br. of Appellant at 38.
[37] Br. of Appellant at 38 (quoting Maynard v. Cartwright, 486 U.S. 356, 361, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988)).

Graham does not address <u>Baldwin</u>.  Therefore, we reject Graham's vagueness challenge.

We affirm the judgment and sentence.

_Trickey, ACJ_

WE CONCUR:

_Leach, J._          _Spearman, J._